Docket No. 101316.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

*In re* PETER DEFOREST WINTHROP, Attorney,
Respondent.

*Opinion filed March 23, 2006.*

JUSTICE FITZGERALD delivered the judgment of the
court, with opinion.

Chief Justice Thomas and Justices Freeman, McMorrow,
Kilbride, Garman, and Karmeier concurred in the judgment and
opinion.

**OPINION**

The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a two-count complaint against respondent, Peter Deforest Winthrop, charging him with various violations of the Illinois Rules of Professional Conduct (Rules). The Hearing Board recommended that the charges against respondent be dismissed. The Review Board reversed, found that respondent committed several violations of the Rules, and recommended that respondent be suspended from the practice of law for two years. Respondent filed exceptions to the findings of the Review Board and asks this court to uphold the finding of the Hearing Board dismissing all charges against him or, in the alternative, to impose a sanction of reprimand or censure. The Administrator cross-appeals, seeking respondent's disbarment or, alternatively, a three-year suspension.

## BACKGROUND

Respondent was charged with professional misconduct resulting from his representation of Corrine Rice, a 92-year-old woman for whom he drafted a will and a power of attorney. The complaint alleged that respondent breached his fiduciary duty to Rice; engaged in a conflict of interest by representing Rice when his representation of her was materially limited by his own interests or responsibilities to a third party in violation of Rule 1.7(b) of the Rules (134 Ill. 2d R. 1.7(b)); failed to disclose a material fact to a tribunal when disclosure was necessary to avoid assisting in a client's criminal or fraudulent act, in violation of Rule 3.3(a)(2) (134 Ill. 2d R. 3.3(a)(2)); made a misstatement of material fact to a third person which respondent knew to be false in violation of Rule 4.1(a) (134 Ill. 2d R. 4.1(a)); engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(a)(4) (188 Ill. 2d R. 8.4(a)(4)); and engaged in conduct which tends to defeat the administration of justice or brings the court or legal profession into disrepute in violation of Supreme Court Rule 771 (134 Ill. 2d R. 771).[1]

---

[1]Respondent was also charged with inducing or assisting another to engage in conduct known by respondent to be violative of the Rules, in contravention of Rule 8.4(a)(2) (188 Ill. 2d R. 8.4(a)(2)). However, this charge was dismissed by the Hearing Board, the Review Board affirmed its

The relevant facts presented at the hearing demonstrated that respondent is a sole practitioner with a law office in Bridgeview, Illinois, who was admitted to the Illinois Bar in 1990. In 2000, respondent met Farouq Nobani and represented him on some traffic matters. Respondent also represented Nobani's wife, Sharon Kotrba, on a traffic case. Nobani performed services for respondent in lieu of paying a fee. Specifically, Nobani added Arabic lettering to respondent's law office sign and translated documents and oral conversations related to respondent's immigration practice. Respondent denied that he and Nobani had a social relationship, and characterized Nobani as an acquaintance, not a friend.

In July 2001, Nobani contacted respondent about preparing a will for Rice, an elderly woman who resided in his condominium complex. Respondent testified that he did not respond to Nobani's request initially, but eventually agreed to visit Rice after receiving telephone calls from both Nobani and his wife. Respondent first visited Rice sometime in July 2001 and learned that Rice was never married, had no children and was an only child. Respondent also learned that Rice owned her condominium, had two bank accounts and intended for her neighbor, Farous Hassan, to be the beneficiary and executor of her will.

Approximately one week after this meeting, respondent returned to Rice's apartment with a draft of the will. During that meeting, Rice informed respondent that she also wanted to appoint someone to handle her financial affairs, as it was becoming inconvenient for her to do so herself. Respondent testified that he advised Rice to create a trust, possibly with Northern Trust Bank. He explained that the bank would pay her bills. According to respondent, Rice questioned whether there would be a yearly and/or monthly fee for this service, and when told that a fee would be involved, suggested that Nobani be appointed to manage her finances. Respondent stated that he "gleaned" from his conversation with Rice that she wanted

dismissal, and the Administrator does not challenge the finding. We therefore do not address it here.

Nobani to have unfettered discretion over all of her financial affairs. Respondent drafted a power of attorney pursuant to Rice's requests. Even though he had only drafted 5 to 10 powers of attorney in his career, respondent did not use the Illinois "statutory property power" (755 ILCS 45/3–4 (West 2002)), although he did state that he was familiar with the form.

Respondent contacted Nobani to advise him that he had been designated Rice's power of attorney. Respondent testified that Nobani refused to serve unless language was added to the document protecting him from liability. Accordingly, respondent added a paragraph to the power of attorney which stated: "I, Farouq Nobani, agree to this power of attorney, and hereby promise to do my very best, but under no conditions do I guarantee the outcome of any matter." Respondent stated that Rice agreed to the addition of this language to the document, and understood that Nobani had a duty to take care of her finances and be very careful. Respondent testified that he did not believe that the language was problematic, as it accomplished Rice's goal of authorizing Nobani to manage her financial affairs.

After Rice agreed to the power of attorney, respondent advised her that it had to be signed and notarized. Respondent explained that Rice suggested that they go to Hemlock Bank in Oak Lawn, where she did her banking. At Hemlock Bank, respondent, Nobani, and Rice met with Virginia Paluch. Paluch testified that she was a personal banker and that she knew Rice, as she had assisted her in completing bank transactions many times in the past. She notarized Rice's will and power of attorney.

Paluch testified that she was "uncomfortable" with the documents and the circumstances under which they were signed. Her discomfort stemmed from the fact that Rice's behavior was out of the ordinary: she came to the bank at night, as opposed to the morning; she appeared to be dressed in clothing that belonged to someone else; and she was much less independent than she had been in the past. Paluch also testified that she was concerned about the legitimacy of the documents because respondent and Nobani wanted to withdraw funds immediately. According to Paluch, respondent specifically stated that he wanted money disbursed, not for payment of Rice's bills, but for payment of personal fees he

and Nobani had incurred in assisting Rice. Paluch stated she denied their request, explaining that she could not disburse funds because they did not bring Rice's passbook. She stated that she did this so she could discuss the situation with her manager, JoAnne Reiser.

Respondent testified that Paluch gave him a stack of Rice's unpaid bills and advised him to pay them, and it was arranged that Nobani would return to the bank the following day to pay the bills. Respondent explained that Rice asked him to accompany Nobani to the bank for this purpose, and even though he told her his presence was not necessary and cautioned that he would add $200 to his fee for this service, she directed him to assist Nobani.

Respondent and Nobani went to Hemlock Bank on Saturday, August 4, 2001, and spoke to bank manager JoAnne Reiser. Reiser testified that Rice's power of attorney had been brought to her attention the previous evening by Paluch, as it was not the Illinois statutory property power of attorney with which they were familiar. She advised her employees that she wanted to speak with respondent or Nobani if either returned to the bank and attempted to use the power of attorney, and she was called when respondent and Nobani arrived at the bank. According to Reiser, respondent stated that he was Rice's attorney and was there to inquire about Rice's accounts and to access them for bill paying. Reiser testified that she told respondent she would not honor Rice's power of attorney because it was not the Illinois statutory property power form. Reiser stated that respondent became very upset, threatened to sue the bank and advised her that she was costing Rice "a lot of money."

Respondent and Nobani left Hemlock Bank and proceeded to Advance Bank, where Rice held other accounts. They met with bank manager Alston Rucker. Rucker testified that respondent introduced himself as Nobani's attorney. However, on cross-examination, he admitted that he previously stated, in his deposition, that Nobani introduced respondent as his attorney. Respondent denied telling Rucker that he represented Nobani.

While at the bank, Nobani used the power of attorney to close a certificate of deposit (CD) account held by Rice. The CD was not mature, and Nobani thus incurred a $1,800

penalty. Nobani directed the bank to issue a cashier's check in his name for the remaining balance on the account, which was approximately $87,000. Although respondent was present for a majority of Nobani's conversation with Rucker, and stated that he could clearly hear the conversation, he testified that he did not know Nobani was closing the account, was unaware of the penalty, and did not know that Nobani asked for the cashier's check to be issued in his name. Respondent stated that he was "not focused" on Nobani's conduct, although he sat next to Nobani in Rucker's cubicle as the transaction was occurring.

Evidence presented by the Administrator demonstrated that Nobani opened an account at United Trust and Federal Savings Bank in his own name with the cashier's check he received at Advance Bank. His wife, Sharon Kotrba, was named the beneficiary of the account. Nobani proceeded to write checks from the account for his own personal use. He paid off a car loan of $11,545.99 and wrote checks to "Cash" for large sums.[2]

---

[2]As of August 17, 2001, the balance of Rice's funds in Nobani's account was $2,313.60. Nobani returned the entire sum of Rice's funds pursuant to a probate court order. He was criminally charged, but not convicted. Nobani did not testify in respondent's hearing.

On Monday, August 6, 2001, Fardous Hassan, Rice's neighbor and the beneficiary of her will, went to Hemlock Bank and spoke to JoAnne Reiser. As a result of that conversation, Reiser contacted the Oak Lawn police department and PLOWS Council on Aging (PLOWS).[3] Detective Christopher Parker of the Oak Lawn police department testified that he went to Rice's home later that day after speaking to both Reiser and the Oak Lawn health inspector.[4] Detective Parker explained that respondent was at Rice's condominium when he arrived. Respondent showed Detective Parker a retainer agreement signed by Rice, identified himself as Rice's attorney and told the detective that he was not permitted to speak to Rice outside of respondent's presence. Detective Parker stated that he ignored respondent's directions because he was there to conduct a well-being check, not a criminal investigation.

Detective Parker reported his observations of Rice's condominium. He stated that Rice lived an "eccentric" life. She slept on two folding chairs in her kitchen. Her kitchen counters were covered with collectable items, and both bedrooms, as

---

[3]PLOWS is a social service agency which provides services for elderly individuals residing in the communities of Palos, Lemont, Oak Lawn, Worth and Stickney.

[4]Detective Parker testified that he learned from Alena Visnic, the Oak Lawn residential health inspector, that paramedics were called to Rice's apartment in July 2001 after she collapsed from the heat. Visnic did a well-being check on Rice after the collapse, and on that day, Rice had a pot burning on the stove. Rice had no recollection of these incidents when confronted by the detective.

well as the bathroom, were filled, floor to ceiling, with her belongings. He added that Rice was confused and agitated. Rice repeatedly stated that she was tired of people asking her about her money and that she just wanted to be left alone. Detective Parker noted that he had not questioned her about financial matters during his visit.

Upon leaving Rice's home, Detective Parker advised respondent that PLOWS would be contacted regarding Rice's living conditions. Detective Parker then left his business card in Nobani's door with a note saying, "Please call me regarding Ms. Rice." Detective Parker stated that he received a voice mail message from respondent later that day saying something to the effect of, "You're put on notice that I represent Farouq Nobani as well as Corrine Rice. *** I have to go out of town to Washington, D.C., on a seminar, and I would appreciate it if you wouldn't have any contact or speak to them until I return."

Later that day, respondent went to the PLOWS office with Nobani. Respondent testified that he went there because he was concerned that Fardous Hassan was taking advantage of Rice and wanted to report her.

Reiser testified that respondent contacted her at Hemlock Bank on that day. Respondent told her that he drew up another power of attorney, and Detective Parker had reviewed it and said respondent should bring it to the bank. Reiser advised respondent that she would not allow anyone on her staff to notarize the document.

Jessica O'Leary, a caseworker employed by PLOWS, testified that she visited Rice on Tuesday, August 11, 2001, to conduct a well-being and safety check. She discussed the power of attorney with Rice. At first, Rice did not remember signing it; she then said that signing it was a mistake. Rice stated that she did not want the power of attorney and could handle her own finances. O'Leary thus presented Rice with a revocation of her power of attorney and Rice signed it. O'Leary opined that Rice was suffering from dementia and stated that Rice was confused, agitated and disoriented as to place and time. Nevertheless, she felt that Rice knew what she was signing when she signed the revocation document.

On August 7, 2001, respondent left for a vacation and did not return until August 12, 2001. Upon returning, he learned, from a telephone message from Nobani, that PLOWS was seeking to freeze Rice's accounts and a hearing was scheduled the following day in probate court. He was not served with notice of the proceeding. On the morning of August 13, 2001, before the hearing, respondent contacted PLOWS's attorney, Janna Dutton.

Dutton testified that she was hired to represent PLOWS with respect to Rice's case. Although she was serving as its counsel, Dutton denied advising PLOWS to obtain revocations of Rice's power of attorney and will. In any event, Dutton stated that PLOWS asked her to file a petition allowing PLOWS's staff to access Rice because they believed Nobani improperly withdrew funds from Rice's account. Dutton stated that she received a call from respondent prior to the hearing on these motions. Respondent stated that he represented Nobani. He then asked her why she was bringing a petition to freeze Rice's accounts when "[t]hey [the banks] didn't give us any money anyway." Dutton testified that respondent did not reveal that Nobani had already withdrawn funds from the bank.

Respondent testified that he recalled having a conversation with Dutton prior to the probate hearing, but did not recall the content of the conversation. Respondent also denied telling anyone that he represented Nobani at an any time during the course of his representation of Rice. Specifically, respondent stated that the witnesses who testified that he represented himself as Nobani's attorney were either "confused or they have misunderstood. *** I'm always very clear. I am an attorney. This is for Nobani. If they put the two together, that's something that they misunderstood. I never told anyone that I was Farouq Nobani's attorney."

The record of the probate hearing demonstrates that respondent identified himself as the attorney who prepared Rice's power of attorney. When asked by the court if he represented Nobani, respondent stated, "I'm not representing Nobani." The court then stated: "Now, this alleges Naboni [sic] and Winthrap [sic] [went] to the bank, attempted to close one of her accounts there." Respondent replied: "When Mr. Naboni

[*sic*] and I went to the bank Mr. Naboni [*sic*] asked me to accompany him. And they weren't there to close accounts. They were there because there were unpaid bills. And I have those unpaid bills, condo assessments, utilities and installments and property taxes. But at no time did anyone ever say anything about closing accounts." Respondent did not advise the court that Nobani closed Rice's account at Advance Bank and left the bank with a cashier's check for a large sum of money.

Dutton informed the court that it was her understanding "that Mr. Winthrop had an ongoing interest with Mr. Nobani." The court replied: "And I'm not having a hearing as to whether or not you represented Miss Rice or Mr. Nobani. And you're in kind of shaky waters here and I'm leaving it up to you and the Commission of Professional Ethics to do the right thing." The probate court then entered an order for PLOWS to provide necessary assistance to Rice and for Rice's accounts to be frozen.

The probate court ultimately determined that Rice was incapable of making personal and financial decisions and appointed the office of the public guardian as plenary guardian of her person and estate. Stephen Allen Murphy, the court appointed guardian *ad litem*, testified that Rice needed this protection because she was disoriented as to time and place, easily persuadable and unable to make decisions.

At respondent's disciplinary hearing, several witnesses testified regarding Rice's mental state. The Administrator presented the testimony of Dr. Eden Brandon, who examined Rice and opined that she suffered from dementia. Dr. Brandon stated that she based her opinion on Rice's score on the Multi Mental State Exam (MMSE) and observations of Rice's behavior and living conditions. Dr. Brandon explained that Rice could not state the correct month, year or date; did not know the city in which she lived; and had difficulty recalling information and following directions. Respondent countered this testimony with the testimony of another doctor, who opined that the tests conducted by Dr. Brandon to diagnose Rice's dementia were deficient. Additionally, Rice's friend of 40 years, Mary Cotnoir, testified that she visited Rice in August 2001 and

˘10˘

that Rice was not confused. She explained that she and Rice had a conversation wherein Rice disclosed that "they took all of her money." Rice did not identify "they." Cotnoir opined that Rice was not confused, she was simply brokenhearted because her money had been taken from her.

Prior to the close of evidence in this matter, a Cook County circuit court judge testified on respondent's behalf. She said she has personally known respondent for 20 years through his affiliation with the Masonic organization. It was her belief that respondent is a person of "utmost integrity." She stated that she did not speak to anyone in the legal community about respondent and is not aware of respondent's reputation for truth, honesty or integrity in the legal community. However, she believes he is a man of integrity because her late husband sponsored him for membership in the Masonic Lodge and would not have done so if respondent's integrity was questionable.

The Hearing Board concluded that the evidence presented at the hearing was insufficient to establish that respondent had knowledge of, or was compliant with, Nobani's misconduct. The Hearing Board acknowledged that "some of his [respondent's] actions, such as accompanying Nobani to the bank, were highly unusual and perhaps ill-advised." The Hearing Board then stated: "While we do not countenance all of Respondent's decisions, we attribute his errors in judgment to inexperience with the subject matter rather than lack of due care or an intent to defraud his client." The Hearing Board then recommended that the charges against respondent be dismissed.

The Administrator filed exceptions and objected to the Hearing Board's conclusion. The Administrator also sought leave to file a report regarding prior discipline in the event that the Review Board found misconduct. The Review Board concluded that some of the Hearing Board's findings were against the manifest weight of the evidence. First, the Review Board found that the evidence demonstrated that respondent did breach his fiduciary duty to Rice. Specifically, the Review Board found that the circumstances of Rice's mental state required "special care" to protect her interests. Instead of

providing that care, respondent drafted an extremely broad power of attorney which "contained no restrictions and purported to permit Nobani to use and dispose of Rice's property in any way he wished." The Review Board also concluded that respondent breached his fiduciary duty when he did not attempt to protect Rice's interests when Nobani withdrew a large sum of her money from Advance Bank.

Next, the Review Board found that respondent engaged in a conflict of interest in violation of Rule 1.7(b) by representing Rice when his representation was materially limited by his own interests and his responsibilities to Nobani. The Review Board believed the testimony of witnesses who stated that respondent represented himself as Nobani's attorney over respondent's denial that he made such statements. Furthermore, the Review Board found that the evidence showed that respondent tried to protect Nobani's interests over Rice's by drafting the overly broad power of attorney; adding a clause to the power of attorney designed to protect Nobani; failing to protect Rice's interests at the bank; and attempting to prohibit the police from talking to Rice or Nobani.

The Review Board further concluded that respondent failed to disclose a material fact to the probate court knowing that disclosure was necessary when he did not inform the court that Nobani had obtained Rice's funds from Advance Bank. The Review Board also concluded that the evidence showed that respondent made a misrepresentation of material fact to Dutton when he stated that Nobani had not procured any of Rice's funds, while knowing that Nobani left Advance Bank with funds from Rice's account. Finally, the Review Board concluded that respondent's misrepresentations to the probate court and Dutton demonstrated that he engaged in fraudulent, deceitful conduct and that such conduct served to defeat the administration of justice or bring the courts or legal profession into disrepute. After reaching these findings, the Review Board requested briefing on the issue of sanctions, and granted the Administrator's request to provide the board with information regarding prior discipline.

One member of the Review Board dissented. The dissenter concurred with the majority's finding that respondent made a

material misrepresentation of fact to Dutton, and thus violated Rule 4.1(a). However, with respect to the other findings of misconduct, the dissenter reasoned that the majority improperly overturned the factual findings of the Hearing Board and usurped the role of fact finder.

The Review Board next issued a recommendation with respect to sanctions. The Review Board noted that respondent was previously suspended in 1997, on consent, for two years, and was ordered to pay restitution to a former client. The facts in that case demonstrated that respondent induced a client to invest with a third party and personally guaranteed repayment by the third party. Respondent then refused to honor the guarantee, converted a portion of the client's funds and ultimately made false statements under oath in the disciplinary proceeding and civil proceeding which resulted from his conduct. Respondent was also sanctioned for converting the settlement funds of another client. The Review Board then considered respondent's misconduct in the instant case and recommended a two-year suspension. The dissent recommended a one-year suspension.

Respondent sought leave to file exceptions to this court asserting that the Review Board improperly reversed the Hearing Board's findings, and alternatively arguing that the sanction imposed by the Review Board was unduly harsh. The Administrator filed a cross-petition for leave to file exceptions, seeking respondent's disbarment or, alternatively, a three-year suspension.

ANALYSIS

Respondent contends that the Review Board impermissibly substituted its judgment for that of the Hearing Board when it reversed the Hearing Board's finding that the charges against respondent were not proven by clear and convincing evidence. In response, the Administrator argues that the Review Board properly reversed the Hearing Board's judgment, as it was against the manifest weight of the evidence.

In an attorney disciplinary proceeding, the Administrator bears the burden of proving the allegations in the complaint by clear and convincing evidence. *In re Timpone*, 208 Ill. 2d 371, 380 (2004); 188 Ill. 2d R. 758(b); 166 Ill. 2d R. 753(c)(6). The Hearing Board determines whether the burden has been met, and this court will generally not disturb the Hearing Board's factual findings unless they are against the manifest weight of the evidence. *In re Timpone*, 208 Ill. 2d at 380. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The mere fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently will not justify reversal of a Hearing Board's decision. See *Abrahamson*, 153 Ill. 2d at 88. *Indeed, the findings of fact made by the Hearing Board are to be treated virtually the same as the findings of any initial trier of fact. Timpone, 208 Ill. 2d at 380.* The Hearing Board is afforded great deference because it is in the best position to observe the witnesses' demeanor and judge their credibility, resolve conflicting testimony, and render other fact-finding judgments. *In re Spak*, 188 Ill. 2d 53, 66 (1999)*; In re Hopper*, 85 Ill. 2d 318, 323 (1981). Although the Hearing Board's findings of fact are entitled to deference, this court is responsible for correcting errors in the application of those facts to the law. *In re Owens*, 144 Ill. 2d 372, 377 (1991).

## I. Breach of Fiduciary Duty

Respondent first contends that the evidence presented by the Administrator was insufficient to prove, clearly and convincingly, that he breached his fiduciary duty to Rice and, therefore, the Review Board erred in reversing the Hearing Board's findings as against the manifest weight of the evidence. The Administrator counters that the evidence demonstrated that respondent breached his fiduciary duty to Rice when he drafted an overly broad power of attorney that did not afford Rice adequate protections and included language that was designed to protect Nobani; failed to exercise a heightened duty of care in drafting the document in light of

Rice's age and life circumstances; and failed to protect Rice's interests when he accompanied Nobani to Advance Bank.

The attorney-client relationship constitutes a fiduciary relationship as a matter of law. *In re Gerard*, 132 Ill. 2d 507, 529 (1989). An attorney's fiduciary relationship with his client is one of "undivided fidelity." *In re Vrdolyak*, 137 Ill. 2d 407, 422 (1990). As fiduciaries, attorneys owe to their clients " 'the basic obligations of agency: loyalty and obedience.' " *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 9 (2004), quoting Restatement (Second) of Agency §14N, Comment a, at 80 (1958).

Turning to the Administrator's first allegation, the Hearing Board concluded that respondent did not breach his fiduciary duty to Rice because the power of attorney he drafted did not confer powers that were "out of the ordinary" and did not override the statutory or common law protections Rice would otherwise have been afforded if the Illinois statutory property power of attorney were used. The Review Board rejected this conclusion, finding that the power of attorney drafted by respondent was overly broad and exceeded the customary purposes and terms of a power of attorney. The issue of whether the drafting of Rice's power of attorney amounted to a breach of fiduciary duty hinges on a legal determination of the breadth of the document. If the document provided the same legal protection to Rice that she would have been afforded under the statutory version, we cannot say that respondent breached his duty of care. We therefore review this question of law *de novo. Owens*, 144 Ill. 2d at 377.

A comparison of the power of attorney in question to the Illinois statutory property power of attorney demonstrates that the power of attorney drafted by respondent was not overly broad. Nobani was given full power and authority to sign Rice's name to affidavits, drafts and checks; to withdraw money on her behalf from any financial instruments or accounts; to dispose of and use all accounts and real property; to dispose of and use all of Rice's monies; and to handle her financial affairs as he saw fit. The statutory property power form provides the same powers. Under the statute, a power of attorney is given authority "to exercise all powers" with respect to real estate, financial institution transfers, securities, tangible personal

property, safe deposit matters, insurance and annuity contracts, retirement plan account balances, social security, unemployment, military service and governmental benefits, tax matters, claims and litigation, commodities and options, business interests and operations, secured and unsecured borrowing, estates and trusts, and all other property powers and transactions "which the principal could if present." 755 ILCS 45/3–4 (West 2002). It is implicit in the statutory language that the agent is authorized to handle these matters in the way he or she deems appropriate. Nobani was given this same authority. Thus, because the power of attorney drafted by respondent provided Nobani with no greater authority than he would otherwise have been provided under the Illinois statutory property power form, we cannot conclude that respondent breached his fiduciary duty on this basis.

The Review Board further found that respondent breached his fiduciary duty to Rice when he added a clause to the power of attorney designed to protect Nobani from liability. Respondent acknowledges that the language he added to the power of attorney was inartful, but nevertheless maintains that it did not override the statutory and common law protections afforded to Rice. Respondent asserts that, even with the added language stating "I, Farouq Nobani, agree to this Power of Attorney, and hereby promise to do my very best, but under no conditions, do I guarantee the outcome of any matter," Nobani was not relieved of liability for negligence, and was still bound to exercise due care. The Administrator counters that respondent's decision to add this language to the power of attorney demonstrates that respondent's loyalties were divided between Rice and Nobani.

Section 3–4 of the Illinois Power of Attorney Act (755 ILCS 45/3–4 (West 2002)) provides that "[t]he agent [of a power of attorney] will be under no duty to exercise granted powers or to assume control of or responsibility for the principal's property or affairs; but when granted powers are exercised, the agent will be required to use due care to act for the benefit of the principal in accordance with the terms of the statutory property power and will be liable for negligent exercise." As the plain language of the statute makes clear, agents are required to

exercise due care if they choose to act and will be held liable for negligent conduct.

The language added by respondent to Rice's power of attorney did not serve to relieve Nobani from his responsibility to act with due care, nor did it relieve him from liability in the event of negligence. Respondent's inartfully drafted clause did nothing more than assuage Nobani's anxiety. Thus, we cannot say that respondent breached his fiduciary duty to his client, Rice, in adding this language to the power of attorney.

The Administrator maintains that respondent was not exhibiting loyalty to his client when he added language to the power of attorney designed to protect the agent at his client's expense. While we acknowledge that respondent's actions show a lack of good judgment, the unrebutted evidence presented at the hearing indicated that respondent knew that this language would afford Nobani no more protection than that to which he was already entitled. The unrebutted evidence also indicates that respondent added the language believing that it would ensure the result Rice allegedly desired–namely, obtaining Nobani as her agent. There is no evidence that he inserted the language intending to protect Nobani. Moreover, the record demonstrates that respondent explained the effect of the language to Rice, and she agreed that it should be added to the document. In light of these facts, we cannot find that the Hearing Board erred in concluding that the evidence was insufficient to support the charge against respondent.

The Review Board found that respondent nevertheless breached his fiduciary duty in failing to draft a power of attorney that contained added protections in light of Rice's age and life circumstances. Drawing from the Review Board's findings, the Administrator asserts that, because Rice was an elderly woman with no family to protect her, who arguably suffered from some cognitive deficiency, she was clearly at risk of exploitation and respondent thus had a heightened duty to protect her interests.

The Hearing Board made no factual findings regarding Rice's mental state, and evidence was presented on both sides of this issue. There was testimony indicating that Rice was disoriented and confused and that her cognitive deficiencies

were apparent. Conversely, there was evidence presented which suggested that Rice was not confused and was able to function. However, the unrebuted evidence demonstrates that Rice gave respondent specific instructions regarding her wishes with respect to the power of attorney, and respondent followed those instructions. Respondent testified that, in his opinion, Rice was lucid and understood the nature and purpose of the document; thus, he did not find it necessary to question her decisions or her capacity to make them.

The Administrator cites our decision in *In re Rosin*, 118 Ill. 2d 365 (1987), as support for its contention that respondent had a heightened duty to draft a document which adequately protected Rice's interests in light of her particular circumstances. We disagree with the Administrator's interpretation of *Rosin*, and find that the case is readily distinguishable. In *Rosin*, the respondent was charged with several rule violations, including failing to demonstrate "undivided fidelity" to his client and engaging in conduct which "prejudice[d] or damage[d]" his client. *Rosin*, 118 Ill. 2d at 379. The facts demonstrated that the respondent facilitated his client's investment in a small, close corporation, namely, a stamp business. The respondent had a close personal and professional relationship with a primary shareholder in the business. The respondent drafted the investment agreement, but did not take steps to ensure that the investment was in his client's best interests and ultimately drafted a document which did not provide adequate protection to his client. Significantly, the respondent was aware that his client was mentally ill, sustained a severe head injury which left her with serious physical and mental deficiencies, and was frequently under the influence of strong prescription drugs with debilitating side effects. The respondent argued that his drafting of the agreement was a "ministerial act" which did not call for the exercise of his professional judgment. *Rosin*, 118 Ill. 2d at 379. We disagreed, stating: "Particularly given Fann's [the client] precarious emotional condition [citation], as well as the inherent riskiness of an investment in a small, close corporation, the respondent's drafting of provisions for security in the formal investment agreement was crucial." *Rosin*, 118 Ill. 2d at 381.

The facts of *Rosin* are distinguishable from this case because, there, the attorney was well aware of his client's mental deficiencies, which were previously diagnosed by

medical professionals. The respondent was not required to make an assessment of his client's competence, only to be punished later when his assessment was incorrect. Furthermore, unlike *Rosin*, the document drafted by respondent in this case adequately protected Rice's interests, as it mimicked the Illinois statutory property power of attorney and did not provide Nobani with any additional protections against liability. Thus, the *Rosin* case is inapplicable to the circumstances before us.

Respondent next contests the Review Board's finding that he breached his fiduciary duty to Rice by failing to protect her assets when Nobani withdrew a large sum of money from Advance Bank and sustained a sizable penalty for the withdrawal. Respondent asserts that he took several steps to ensure that Rice's money was protected, including questioning Nobani about what he intended to do with the withdrawn funds and informing Rice about the events that occurred at both banks.

We are compelled to note that respondent's testimony with respect to the events which occurred at Advance Bank at the time Nobani withdrew the money in question is suspicious. Respondent's version of events are difficult to believe when he states that he sat in a cubicle with Nobani and the bank manager and, yet, did not have any knowledge of the content of their conversation. Equally suspect is respondent's testimony that he believed Nobani was using the withdrawn funds to pay Rice's bills when the evidence demonstrates that respondent was in possession of the bills and there is no suggestion that he turned them over to Nobani for payment. That being said, according to the unrebutted testimony, respondent accompanied Nobani to the bank at Rice's request for the purpose of ensuring that the power of attorney would be honored and Nobani would gain access to Rice's accounts. Nobani acted within the authority that was granted to him by the power of attorney because, under that document, Nobani was permitted to withdraw funds and handle Rice's finances as he saw fit. Respondent did not have a fiduciary duty to protect Rice from Nobani's conduct when Nobani's conduct was authorized by the power of attorney Rice had executed.

Accordingly, while we do not condone respondent's conduct, we cannot say that it rises to the level of a breach of fiduciary duty warranting discipline.

## II. Conflict of Interest

Respondent next asserts that the Review Board erred in reversing the Hearing Board's findings with respect to the issue of conflict of interest. The Review Board found that respondent violated Rule 1.7(b) because his representation of Rice was materially limited by his own interests and his responsibility to a third party, namely, Nobani. The Review Board concluded that the Hearing Board's dismissal of this charge was against the manifest weight of the evidence because respondent held himself out to several persons as Nobani's attorney. Respondent maintains that the Review Board once again improperly substituted its judgment for that of the fact finder. The Administrator argues that respondent did represent Rice under a conflict of interest because he held himself out as Nobani's attorney in word and in deed and engaged in conduct aimed at benefitting Nobani at Rice's expense, namely, failing to advise Rice against choosing Nobani as her agent and failing to protect Rice's funds.[5]

Rule 1.7(b) provides: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." 134 Ill. 2d R. 1.7(b). In

---

[5]The Review Board also concluded that respondent engaged in a conflict of interest by and adding language to Rice's power of attorney that was intended to protect Nobani at Rice's expense. As we have already concluded that this language did not have this effect, we will not revisit the issue even though it is raised again by the Administrator and was considered by the Review Board.

considering whether respondent represented Rice under a conflict of interest, we are mindful that, while the circumstances of respondent's representation of Rice may arouse suspicion, "suspicious circumstances, standing alone, are not sufficient to warrant discipline." *In re Lane*, 127 Ill. 2d 90, 111 (1989).

The facts of this case demonstrate that Nobani and his wife, Kotrba, contacted respondent to prepare a will for Rice, an elderly woman in their apartment complex whom they recently befriended. Their decision to contact respondent was not random–they contacted him because Nobani and respondent had an ongoing business relationship. In the course of discussing the will, respondent agreed to draft a power of attorney for Rice. Respondent testified that the power of attorney was Rice's idea and was drafted at her behest. As previously noted, one can question the veracity of this claim, as witnesses testified that Rice was not alert enough to know the year or the city in which she lived, thus making it difficult to believe that she knew that she wanted a power of attorney and requested one without solicitation. Nevertheless, respondent's testimony, which was unimpeached, indicated that Rice wanted a power of attorney and gave specific directions regarding her desired agent and the authority she intended to convey to him. There is no evidence suggesting that respondent influenced Rice's decision or that he assisted Nobani in exerting influence over Rice.

Once the power of attorney was executed, Nobani withdrew a large amount of money from Rice's bank account and then misappropriated the funds for his own use. There is no evidence that respondent participated in or benefitted from the misappropriation. Subsequently, an investigation into Rice's living conditions ensued, stemming partly from concerns about Rice's dealings with Nobani and respondent, and partly from previous events that occurred resulting in Rice requiring medical attention. During the course of the investigation, respondent accompanied Nobani to the PLOWS office to obtain information about the investigation and present Nobani's "side of the story." Respondent also advised the investigating detective not to speak to Nobani without respondent being present.

We recognize that the Administrator presented the testimony of Alston Rucker, Janna Dutton and Detective Parker, who said that respondent identified himself as Nobani's attorney. Yet, Rucker's testimony was impeached by his prior deposition testimony. Dutton testified that respondent told her he was representing Nobani, but she did not relay that information to the probate court when given the opportunity–instead, she advised the court that it was her "understanding" that respondent had an "ongoing interest" with Nobani. Detective Parker's testimony was based on his recollection of one telephone message which he heard some four years prior. Considering these facts, we cannot say that the Hearing Board's decision to reject this testimony was against the manifest weight of the evidence. Moreover, respondent adamantly denied ever stating that he was Nobani's attorney, and explained that persons who believed he made such a representation must have been confused or drawn their own assumptions based on the fact that he assisted Nobani at Rice's behest. Respondent also stated on the record in the probate proceeding that he was not representing Nobani.

We cannot ignore the fact that respondent's conduct with respect to Rice and Nobani was suspicious, and at the very least, demonstrated extremely poor judgment. However, the evidence presented regarding respondent's loyalties and responsibilities to Nobani was conflicting. The Hearing Board, which heard all of the evidence and was in the best position to assess the credibility of the witnesses and weight that should be afforded to their testimony, determined that there was a "lack of any clear evidence that Respondent was representing Nobani in a legal matter or that he was placing Nobani's interests ahead of Rice's." In light of the conflicting evidence presented, we cannot say the Hearing Board's judgment was so unreasonable as to be against the manifest weight of the evidence. Accordingly, we conclude that the Review Board improperly substituted its judgment for that of the fact finder in this regard.

III. Failure to Disclose a Material Fact to a Tribunal

˘22˘

Respondent next asserts that the Review Board erred in finding that he committed a violation of Rule 3.3(a)(2) when he failed to advise the probate court that Nobani had closed Rice's account at Advance Bank and was in possession of a substantial amount of her funds. Rule 3.3(a)(2) provides: "In appearing in a professional capacity before a tribunal, a lawyer shall not: *** (2) fail to disclose to a tribunal a material fact known to the lawyer when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client." 134 Ill. 2d R 3.3(a)(2). Respondent maintains that he could not have violated this rule because Nobani was not his client. The Administrator counters that the Review Board's decision was proper because respondent told several persons that he was Nobani's attorney and behaved as if Nobani was his client.

We find that the Review Board erred in finding that respondent violated Rule 3.3(a)(2). The Hearing Board determined that the evidence presented was insufficient to establish that respondent was acting as Nobani's attorney or that respondent had any knowledge that a criminal or fraudulent act either had been committed or was going to be committed by Nobani. We cannot say that this finding was against the manifest weight of the evidence. As previously stated, conflicting evidence was presented regarding respondent's statements concerning representation of Nobani. The Hearing Board assessed the credibility of the witnesses and the weight that should be afforded to their testimony, and ultimately settled the conflict in respondent's favor. It's conclusion was supported by the evidence. As respondent asserts, Rule 3.3(a)(2) applies if an attorney fails to disclose the criminal or fraudulent act of a *client*; we cannot apply the rule here, where the fact finder reasonably found the evidence to be insufficient to show that respondent represented Nobani.

Likewise, with respect to knowledge of fraudulent conduct, the Hearing Board concluded that there was no evidence presented which demonstrated that respondent was "in cahoots" with Nobani or knew of Nobani's improper usage of Rice's funds. The evidence demonstrates that respondent was aware that Nobani withdrew money from Rice's account at Advance Bank, and although respondent testified otherwise,

we do not believe that he was unaware of the actual sum removed, given that he was present during Nobani's conversations with the bank manager and physically in the same room when Nobani received the check. However, there is no indication that Nobani shared his plans to misappropriate the money with respondent, that respondent benefitted from the misappropriation or that respondent assisted Nobani in any fraudulent conduct. Accordingly, the Hearing Board's determination that the evidence was insufficient to prove a violation of Rule 3.3(a)(2) was not against the manifest weight of the evidence.

We note, however, that our conclusion in this regard is not meant to condone respondent's conduct. Respondent attended the probate proceeding knowing that PLOWS was going to present a petition to freeze Rice's assets based on its belief that Nobani was improperly handling her finances. Respondent knew, at the very least, that Nobani walked out of Advance Bank with a check from Rice's account. Although respondent denies knowledge of Nobani's discussions with Alston Rucker at Advance Bank, the facts show that respondent sat next to Nobani during the entire transaction. It stands to reason that he was aware that Nobani closed Rice's CD account and had the check made payable to himself . Nevertheless, respondent stood silent as Nobani told the probate judge that he needed access to Rice's money so he could pay her bills, even though respondent had to know that Rice's bills did not exceed the amount already obtained by Nobani, particularly since the record establishes that respondent was in possession of the bills. Respondent should have disclosed this information to the court, as it was clearly significant in light of the nature of the proceedings at hand. While his failure to do so may not be sanctionable under Rule 3.3(a)(2), we feel compelled to note that respondent's conduct demonstrates a lack of judgment that is quite disturbing, particularly for a long-standing member of the bar who was previously sanctioned for dishonest conduct. We likewise remind respondent that "[a] lawyer's 'high vocation is to correctly inform the court upon the law and the facts of the case and to aid it in doing justice and arriving at correct conclusions.' " *In re Braner*, 115 Ill. 2d 384, 392 (1987),

quoting *People ex rel. Attorney General v. Beattie*, 137 Ill. 553, 574 (1891).

IV. False Statement of Material Fact to a Third Person

Respondent next asserts that the Review Board erred in reversing the Hearing Board's finding that the evidence was insufficient to prove that respondent violated Rule 4.1(a) by providing false information to Janna Dutton when he told her that she did not need to pursue an order to freeze Rice's assets because Nobani was denied all access to Rice's accounts. The Administrator counters that the Hearing Board's judgment was against the manifest weight of the evidence, as Dutton's testimony regarding respondent's statements was unrebutted.[6]

Rule 4.1(a) provides: "In the course of representing a client a lawyer shall not: (a) make a statement of material fact or law to a third person which statement the lawyer knows or reasonably should know is false." 134 Ill. 2d R. 4.1(a).

In this case, the Hearing Board determined that respondent's conduct during the telephone conversation with Dutton did not rise to the level of a violation of Rule 4.1(a). Specifically, the Hearing Board stated that discipline was not required because respondent had no knowledge as to what Nobani had done with Rice's funds and respondent's statements to Dutton did not change her course of action, insofar as she still sought the freeze order on Rice's accounts. The Hearing Board also noted, in a footnote, that it had questions about Dutton's credibility, as she testified that she did not recall another conversation with a PLOWS caseworker. The Hearing Board, however, did not make an actual credibility determination.

---

[6]The Administrator also alleges that respondent told Dutton that he represented Nobani. However, as we have previously addressed the issue, we will not revisit it.

The Review Board determined that the Hearing Board's finding was against the manifest weight of the evidence, as the unrebutted evidence presented at the hearing demonstrated that respondent made a material misrepresentation to Dutton. We agree with the Review Board's conclusion.

The evidence presented to the Hearing Board demonstrated, clearly and convincingly, that respondent made a false statement of fact to Dutton. Dutton described her conversation with respondent in detail, and unequivocally testified that respondent stated that Nobani was denied access to Rice's funds. Dutton testified that respondent specifically asked her why she was bringing a petition to freeze Rice's accounts when "[t]hey [the banks] didn't give us any money anyway." She stated that she recalled the conversation in detail because she believed respondent, and thought that she would not have to pursue the freeze order as aggressively as she initially had planned. Respondent provided no evidence which impeached Dutton's statements. In fact, respondent did not even deny that he made the statements. Respondent merely testified that he could not recall the content of his conversation with Dutton.

Respondent urges that Dutton's testimony was incredible and, in support, points to conflicts between Dutton's testimony and that of caseworker O'Leary with respect to the revocations of Rice's will and power of attorney. We are aware of the conflicts in that testimony, but we find that it has no bearing on the issue before us. Dutton's testimony regarding respondent's false statements to her was uncontradicted and unimpeached. There was no conflict over this evidence, as respondent did not deny making the statements Dutton attributed to him. Accordingly, we reject respondent's credibility argument.

Furthermore, the evidence presented demonstrated that respondent had to know that his statement to Dutton was false, as he was physically present when Nobani closed Rice's bank account at Advance Bank, watched Nobani receive a cashier's check, and by his own admission, asked Nobani what he intended to do with the money. Respondent's false statement was material, because preventing Nobani from accessing Rice's funds was one of the primary purposes of the probate

hearing. Providing the court with information that could have aided in protecting Rice's assets should have been respondent's main concern as Rice's attorney. Had Dutton acted upon respondent's false statement, Nobani could have continued to deplete Rice's resources.

The Hearing Board ignored this evidence, and found that discipline was unwarranted. However, we conclude the basis of its judgment was improper. Regardless of facts demonstrating that respondent did not know about Nobani's improper conduct and, likewise, did not actually impede Dutton's actions in protecting Rice, the evidence shows that respondent made a false statement of material fact to Dutton. Whether respondent's falsehood ultimately had an effect on Dutton's conduct is inconsequential. Accordingly, we conclude that the Hearing Board's finding was against the manifest weight of the evidence, and thus find that the Review Board properly reversed the Hearing Board's judgment with respect to this charge.

## V. Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation

Because we have concluded that respondent made a false statement of material fact to Dutton, we necessarily conclude that respondent violated Rule 8.4(a)(4) and Supreme Court Rule 771. Rule 8.4(a)(4) provides that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." 188 Ill. 2d R. 8.4(a)(4). Supreme Court Rule 771 provides that conduct "which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute shall be grounds for discipline by the court." 134 Ill. 2d R. 771. Respondent violated both of these rules when he relayed false information to Dutton regarding Nobani's ability to access Rice's funds. His conduct involved dishonesty, deceit, and misrepresentation which brought the legal profession into disrepute.

## VI. Sanctions

The Administrator asserts in its cross-appeal that respondent should be disbarred for his conduct in handling the preparation of Rice's will and power of attorney. In support of its claim, the Administrator cites several cases where attorneys received lengthy suspensions or were disbarred for defrauding elderly clients or converting their funds. See *In re Holst*, 201 Ill. 2d 628 (2002); *In re Wiard*, 198 Ill. 2d 662 (2002); *In re Garside*, 195 Ill. 2d 607 (2001); *In re Bartley*, M.R. 15176 (1998); *In re Singer*, M.R. 14064 (1997); *In re Rotman*, 136 Ill. 2d 401 (1990). We have not found that respondent committed fraud or engaged in conversion of Rice's funds. Accordingly, we will not consider the Administrator's arguments in this regard. We nevertheless agree with the Administrator's assertion that respondent's misconduct was serious in nature, and thus reject respondent's argument that censure, at most, is an appropriate sanction.

We bear in mind that this court is not bound by the disciplinary recommendations of either the Hearing Board or the Review Board because those recommendations are advisory and this court bears the ultimate responsibility for imposing discipline. *In re Howard*, 188 Ill. 2d 423, 434 (1999). The purpose of attorney disciplinary proceedings is not to punish the attorney, but rather to protect the public, maintain the integrity of the legal profession, and protect the administration of justice from reproach. *In re Spak*, 188 Ill. 2d 53, 67-68 (1999). We are mindful of the goals of consistency and predictability in the imposition of sanctions. *In re Rosin*, 118 Ill. 2d 365, 387 1987. However, we recognize that each case is unique and must be decided on its own facts. *In re Crane*, 96 Ill. 2d 40, 65 1983. This court considers evidence in aggravation and mitigation prior to imposing sanctions. *In re Lidov*, 129 Ill. 2d 424, 430 1989.

In determining the appropriate sanction for respondent, we consider in aggravation the fact that respondent was previously suspended from the practice of law for two years for dishonest and deceitful conduct, which involved failing to honor a guarantee respondent made to a client on a promissory note; converting client funds on two separate occasions; and making false statements under oath in a disciplinary proceeding and a civil proceeding. We find it significant that respondent's prior

discipline stemmed from conduct involving dishonesty and the telling of falsehoods. We also consider aggravating the fact that respondent's misstatement to Dutton evinces a disregard for the interests of his client. Instead of assisting Dutton in protecting the elderly Rice, respondent made a material misrepresentation of fact which, if heeded, would have allowed Nobani to continue to pilfer Rice's funds. Had Dutton chosen to forgo the freeze order, respondent's misrepresentation would have given Nobani further opportunity to victimize Rice.

Conversely, we consider in mitigation the lack of evidence demonstrating that respondent knew of Nobani's plan to improperly convert Rice's funds, received any funds from Rice's account or benefitted in any way from Nobani's conduct. Although respondent saw fit to deceive Dutton regarding Nobani's ability to access Rice's funds, we cannot conclude, based on the evidence presented, that he provided false information for his personal benefit.

Considering the serious nature of respondent's conduct, the circumstances surrounding it, and his significant prior discipline, we conclude that a two-year suspension is appropriate in this case.

*Respondent suspended.*