2015 IL App (2d) 140862
No. 2-14-0862
Opinion filed August 13, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10-CF-26 |
| JUVENTINO CARRANZA-LAMAS, | ) ) | Honorable Gordon E. Graham, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SPENCE delivered the judgment of the court, with opinion.
Justice Burke concurred in the judgment and opinion.
Justice Hutchinson specially concurred, with opinion.

**OPINION**

¶ 1     Defendant, Juventino Carranza-Lamas, appeals from the trial court's denial of his postconviction petition after a third-stage evidentiary hearing. Defendant argues that the trial court should have determined that his trial counsel's performance was constitutionally deficient under *Padilla v. Kentucky*, 559 U.S. 356 (2010), because counsel failed to advise him of the immigration consequences of his guilty plea. We conclude that defense counsel was not obligated to inform defendant of the specific consequences that pleading guilty to a drug crime and receiving first-offender probation would have on discretionary immigration relief. Therefore, we affirm.

¶ 2                                I. BACKGROUND

¶ 3    On February 25, 2010, defendant was indicted on one count of unlawful possession of less than 15 grams of cocaine (720 ILCS 570/402(c) (West 2010)).  The crime was alleged to have taken place on January 12, 2010.

¶ 4    On September 27, 2011, defendant entered a fully negotiated guilty plea to the charge, a Class 4 felony.  Before the trial court accepted the plea, it stated: "I must advise you conviction of this offense may have the consequences of deportation, denial of naturalization or exclusion of admission to the United States if you are not a citizen of the United States."  Defendant stated that he still wished to plead guilty.  He received two years of first-offender probation (720 ILCS 570/410 (West 2010)), with conditions as well as fines and costs.  The State nol-prossed other, traffic-related charges.

¶ 5    After the trial court accepted the plea, defense attorney John Gaffney had the following exchange with the trial court:

"MR. GAFFNEY: Judge, if I can just clarify for the record, because he does have an immigration hearing pending.

THE COURT: Yes.

MR. GAFFNEY: Your Honor said a judgment of conviction enters.  It is 1410 [*sic*] probation.

THE COURT: It is.  And I say that because the appeal time runs today.

MR. GAFFNEY: Certainly, Judge.

THE COURT: If he complies with the sentence, then there will be no conviction.

MR. GAFFNEY: Thank you, Judge.  I wanted to clarify that for the record.

Thank you, your Honor."

¶ 6    Defendant's probation was terminated on September 27, 2013. Three days before that, on September 24, 2013, defendant filed a petition under the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2012)), alleging ineffective assistance of counsel. Defendant alleged as follows, in pertinent part. Federal immigration officials had been seeking his deportation since 2009, before the incident in this case, based on his undocumented status. A sentence of probation under section 410 of the Illinois Controlled Substances Act (720 ILCS 570/410 (West 2010)) was considered to be a conviction under federal immigration law. An immigration judge had ordered him deported on September 19, 2013, and that ruling was on appeal. However, defendant's immigration counsel had advised him that he would be able to reopen his deportation case and seek immigration relief if his " 'conviction' " in this case were vacated. Immigration counsel was confident that he could obtain a lawful permanent resident status for defendant if the conviction were vacated, because defendant's fiancé, who was also the mother of his children, was a United States citizen. Prior to pleading guilty, defendant told Gaffney that he was not a United States citizen and did not wish to be deported. However, Gaffney rendered ineffective assistance by affirmatively misadvising defendant that a guilty plea and section 410 probation would not be a conviction for immigration purposes.

¶ 7    Defendant argued that, under *Padilla*, Gaffney had an obligation to correctly advise him as to his plea's immigration consequences. Defendant argued that Gaffney's deficient performance also caused prejudice, in that he would not have otherwise pleaded guilty but would instead have gone to trial. Defendant argued that he would have had a substantial likelihood of success at trial because (1) he was not the owner of the vehicle in which the drugs were found; (2) he had been driving the vehicle for just a few minutes before the traffic stop; (3) the drugs were hidden from view underneath a speaker box, behind the backrest of the truck's bench seat;

and (4) he denied having knowledge of the drugs to the police. Defendant maintained that, had Gaffney advised him of the clear immigration consequences, he would have made a rational decision to go to trial or, at a minimum, attempted to obtain a plea disposition that did not result in automatic deportation.

¶ 8 Defendant attached to the petition an affidavit of his fiancé, Daisy Cazares, who stated that the vehicle belonged to her; that she learned that defendant had been pulled over shortly after she allowed defendant to borrow the truck; that it would be difficult to get a hand through the crevice between the backrests; and that while seated a driver would not be able to reach behind to the speakers mounted on the back wall, which were about 12 to 18 inches below the top of the backrest.

¶ 9 Defendant also attached to the postconviction petition a letter from his immigration attorney.

¶ 10 On November 15, 2013, the trial court docketed the petition for second-stage proceedings. The State filed a motion to dismiss on December 2, 2013. It argued that defendant could not establish prejudice, because the trial court advised him that the conviction could result in deportation. Defendant responded that the trial court's admonishment raised only the possibility of potential consequences triggered by a conviction, whereas Gaffney had told him that he could not be deported as a result of section 410 probation because it was not a conviction. Therefore, according to defendant, the trial court's admonishment did not negate the improper advice. The trial court denied the motion to dismiss on February 21, 2014.

¶ 11 A third-stage evidentiary hearing took place on April 17, June 12, and June 13, 2014. We summarize the testimony presented.

¶ 12    David Adkison, defendant's immigration attorney, testified as follows.  He began representing defendant in September 2012 in immigration court proceedings.  Defendant was charged with being in the United States without permission, and deportation was sought.  During the proceedings, defendant's drug offense came to light.  Adkison initially obtained a continuance in immigration court to allow defendant time to pursue postconviction relief, but the immigration court denied further requests for continuances.  It ordered defendant removed, and he was appealing that judgment.

¶ 13    Even though defendant received section 410 probation, it was considered a conviction under federal law.  There was a "waiver" available for possession of small amounts of marijuana, but not other drugs.  Adkison was aware that defendant planned to marry Cazares, a United States citizen.  If the drug conviction remained, defendant would have "no way of processing his residency," even with a wife who was a citizen.  If the conviction were vacated and defendant married Cazares, he would still have to go back to Mexico temporarily because he was in the United States without permission.  Normally, a person would then have to wait 10 years before applying for a visa.  However, an exception applied if the person was married to a United States citizen and there was "extreme hardship" on the spouse.  Defendant could likely obtain this "waiver" and return sooner, because he had children and was involved in their lives and because he had likely been contributing financially to the household.  Defendant could then obtain lawful permanent residency.  Once defendant was married and the deportation case was reopened, the process could possibly be completed within one year.  Any misdemeanor traffic convictions would not bar immigration relief.

¶ 14    Adkison agreed that defendant was involved in deportation proceedings based on his coming into the country illegally and that they had nothing to do with the drug charge.  However,

defendant would have other avenues for relief if he did not have the drug conviction. Adkison agreed that, if an illegal immigrant were convicted of a drug charge, it did not necessarily mean that that person would be deported, and it would be accurate advice to tell the person that he or she could be deported; although immigration officials were very likely to come after a person with a drug conviction, it was not a certainty.

¶ 15 Cazares provided the following testimony. At the time of the underlying offense, she and defendant were engaged and living together, and she was pregnant with his child. They had been in a relationship since 2008. On January 12, 2010, around 4:30 p.m., defendant had just arrived home and was watching Cazares's children. He called and asked if he could borrow one of her vehicles to pick up his brother, who needed a ride. Defendant had previously gotten pulled over for driving without a license, and he had been put into the immigration court system as a result. Still, because defendant's brother was stranded, Cazares said that he could take her truck. She had purchased that vehicle from someone about six months prior. It had bench seats and no back seats. There was a center armrest between the driver's and passenger's seats, and behind the seats were speaker boxes that could not be reached while seated.

¶ 16 Cazares testified that Gaffney was not fluent in Spanish, so she would translate during the meetings with defendant. Cazares told Gaffney about the immigration proceedings. She told him that they had previously consulted with immigration lawyers, who said that, if defendant pleaded guilty or had a conviction on his record, it would hurt his immigration status. Cazares said that they planned to marry and that the case could ruin their plans for their future together. Cazares further told Gaffney that she needed to stay in the United States to receive child support for her two older children. Gaffney said that, if defendant pleaded guilty and received section 410 probation, it would not be considered a conviction for immigration purposes. Defendant

agreed to plead guilty based on this representation. Gaffney never informed them that defendant had the right to go to trial. When the subject of a trial came up, Gaffney said that he would speak with the State and see what kind of deal they could get.

¶ 17    Before defendant pleaded guilty, Cazares and defendant never spoke to an immigration attorney about the ramifications of section 410 probation. They hired Adkison after defendant's arrest, but Cazares did not remember if it was before or after defendant pleaded guilty. By the time they mentioned the probation to Adkison, defendant had already pleaded guilty.

¶ 18    Defendant was the father of Cazares's two younger children, who were 3 and 1½. Cazares agreed that she and defendant had been engaged for four years but had not set a wedding date. They were waiting because of the possibility that defendant would be deported; they would not be able to maintain their relationship if defendant had to live in Mexico. In the month before defendant was arrested, three of Cazares's family members had borrowed her truck. It had also been at a repair shop for two weeks. Cazares was shown pictures of the interior of the vehicle and denied that there was any way for someone to have reached back between the seats. Cazares agreed that she never reported this information to the police.

¶ 19    Defendant testified as follows. Gaffney's Spanish was not very clear, so Cazares would translate between them. Gaffney told him that, if he complied with all of the conditions of the section 410 probation, there would be no conviction or issues with immigration. At the time, Cazares was pregnant with his child, so it was important for defendant that the drug case not affect his immigration status. Defendant would not have pleaded guilty if Gaffney had told him either that the section 410 probation would result in his deportation or that it would mean that his eventual marriage to Cazares could not be used to get him a valid immigration status.

¶ 20    When defendant met with Gaffney, defendant said that the drugs were not his and that Cazares owned the truck.  He had been driving for only two or three minutes before the police stopped him.  The officer recognized him and said that he should not be driving.  Defendant had previously been stopped for driving without a license, and it resulted in the immigration proceedings.  The officer told defendant to get out of the truck.  The officer asked if he could search the truck, and defendant agreed.  Another officer arrived, and they had a dog enter the truck.  The officers said that the dog found cocaine behind the seat.  Defendant said that it was not his.  Defendant testified that that area was not accessible from the driver's seat.  When defendant was stopped by the police, he bent down to grab proof of insurance that was inside the glove compartment.

¶ 21    Defendant did not know that he had a right to a trial, and Gaffney never spoke about it. Defendant did not recall the trial court advising him of the right.  Defendant had spoken to two or three immigration attorneys about the consequences of a guilty plea, and they said that if he had a felony conviction he would not be able to fight the immigration case.  Before pleading guilty, he did not speak to them about the consequences of section 410 probation.

¶ 22    We next summarize Gaffney's testimony.  Defendant retained him in January 2010. Gaffney was aware that defendant was in the United States illegally and had an immigration case pending.  Defendant seemed uncertain whether to take the section 410 probation or go to trial and try to avoid the immigration consequences.  Gaffney told defendant that the section 410 probation would have immigration consequences.  Gaffney testified:

    "Generally what I told him was I said he needed to consult his immigration
        attorney.  I told him I don't do immigration.  I know he had an immigration attorney, and

I certainly don't want to step on another attorney's toes by giving him advice that may be contrary to what they're giving their clients especially in the area that I don't practice.

So while I told him I—you know, if you take any kind of felony plea, it's going to have an effect on your immigration case, I always told him you need to talk to your immigration attorney about this."

Gaffney had the discussion with the trial court after the guilty plea[1] because the trial court had stated that a conviction would enter and Gaffney wanted to make sure that the record reflected the terms and conditions of the section 410 probation. He did not know if the section 410 probation would affect immigration, but he wanted the record clarified because defendant needed to go back to his immigration attorney to deal with the guilty plea's consequences. That is, Gaffney wanted the immigration attorney to have accurate information to work from.

¶ 23    Before the plea, Gaffney told defendant that even if there were not a judgment of conviction his guilty plea alone might affect his immigration status. He did not know whether he used the term "deportation" with defendant, but he recalled telling him that any kind of guilty plea to a felony, whether it involved section 410 probation or not, would have immigration consequences and that defendant needed to talk to his immigration attorney. Gaffney agreed that he did not speak to defendant specifically about the effect of a guilty plea on discretionary immigration relief.

¶ 24    Sergeant Ray Lanz of the Woodstock police department provided the following testimony. On January 12, 2010, he was a canine officer. He stopped the truck that defendant was driving, because it did not have a front license plate. After Lanz activated the police lights, the driver appeared to raise himself up, which could be consistent with retrieving something

---

[1] See *supra* ¶ 6.

from a pocket, and leaned to the center of the cab. After pulling the vehicle over, Lanz recognized defendant because he had stopped him the prior week and arrested him for driving on a revoked license. During the present stop, defendant provided an insurance card. Lanz again arrested him for driving on a revoked license. Lanz had a dog check the inside of the truck, and the dog alerted to the odor of illegal narcotics in an area that was consistent with where defendant had been leaning. Lanz moved the driver's seat forward and, at the front base of a speaker box behind the seat, he found a clear plastic bag with a white powder. There was enough space for the bag to fit between the seats, and a driver would have had access to that area. The bag was directly below the gap between the driver and passenger seats.

¶ 25 Lanz agreed that defendant's leaning could have been consistent with retrieving proof of insurance from the glove box. When Lanz asked defendant why he was driving, defendant said that he was picking up his brother from Huntley. Lanz did not ask defendant for permission to search the vehicle. Records indicated that it belonged to Cazares.

¶ 26 The parties stipulated for purposes of the current hearing that the State police lab tested the white powder and determined that it was 0.5 grams of cocaine.

¶ 27 The trial court issued a memorandum ruling on July 2, 2014. It stated as follows, in relevant part. Defendant alleged that Gaffney's performance was deficient in that he told defendant that section 410 probation would not be a conviction for immigration purposes. Gaffney testified that the guilty plea's immigration consequences were always part of his discussions with defendant, and he told defendant to speak to his immigration attorneys. Both defendant and Cazares testified that they had spoken to immigration attorneys while the case was ongoing. With the pending immigration matter, it was clear that defendant would have been worried about a conviction that would have affected his immigration status. Defendant testified

that he never discussed a trial with Gaffney, but the case was set for a jury trial, defendant signed a waiver of a jury trial, and the case was rescheduled for a bench trial. Therefore, it "would seem implausible" that defendant did not discuss a trial with Gaffney. The trial court gave the required admonishments under section 113-8 of the Code of Criminal Procedure of 1963 (725 ILCS 5/113-8 (West 2010)). The effectiveness of such admonishments had been the subject of recent appellate court decisions, which had held that they might or might not be sufficient under the circumstances of a particular case. Defendant alleged that Gaffney's wrong advice would not have been cured by the trial court's admonishments.

¶ 28   The trial court continued as follows. The second prong of the test in *Strickland v. Washington*, 466 U.S. 668 (1984), for ineffective assistance of counsel required a showing of prejudice. Defendant needed to do more than just allege that he would not have pleaded guilty; he needed to articulate a plausible defense that could have been raised at trial. Defendant testified that he had no knowledge of the drugs. Lanz's testimony was more believable as to defendant's "presence in the automobile in which the officer had seen him one week earlier when he was arrested on a different charge." Defendant's claim that he was not the only person who had access to the truck, and Cazares's statement that the area where the drugs were found was inaccessible, were "unavailing." Lanz's testimony established that the area where the drugs were found was consistent with the item being dropped between the seats. Defendant had not made the requisite showing of prejudice under the case's facts.

¶ 29   The trial court stated that the deportation order was impacted by the conviction of possession of a controlled substance, but that the order's basis was actually defendant's illegal presence in the country. That the deportation order was not a direct result of the conviction distinguished this situation from many other cases. That is, the conviction impaired defendant's

ability to resolve his immigration issues but was not a cause of the immigration issues. As such, the trial court did not believe that Gaffney's allegedly deficient performance resulted in prejudice to defendant. In addition, "the matters presented at the evidentiary hearing would establish that Defendant's defense was not completely plausible." The trial court denied the postconviction petition.

¶ 30   Defendant filed a motion to reconsider, which the trial court denied on August 20, 2014. Defendant timely appealed.

¶ 31                                II. ANALYSIS

¶ 32   The Postconviction Act provides a means for people under criminal sentences to assert that their convictions resulted from substantial denials of their constitutional rights. *People v. Smith*, 2015 IL 116572, ¶ 9. The Postconviction Act creates a three-stage process for the adjudication of a postconviction petition. *Id*. At the first stage, the trial court independently determines, without input from the State, whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2012). If the petition survives the first stage, it proceeds to the second stage, during which the trial court may appoint counsel to represent an indigent defendant, and counsel may file an amended petition. *People v. Hommerson*, 2014 IL 115638, ¶ 8. The State, in turn, may file a motion to dismiss the petition. 725 ILCS 5/122-5 (West 2012).

¶ 33   If the trial court does not dismiss the petition, it will conduct an evidentiary hearing on the merits of the petition during the third stage. 725 ILCS 5/122-6 (West 2012). During both the second and third stages of the proceeding, the defendant must make a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). We will not disturb the trial court's decision after an evidentiary hearing that involved fact-finding and credibility

determinations unless the decision is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. On the other hand, if the issues present pure questions of law and the trial judge does not have a special familiarity with the underlying case that affects the petition's disposition, we will review *de novo* the trial court's decision. *Pendleton*, 223 Ill. 2d at 473. Here, the trial court considered witness credibility in arriving at its decision, so we will review its decision for manifest error.

¶ 34    For a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. 668. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). As to trial counsel, the defendant must first establish that, despite the strong presumption that counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice by showing a reasonable probability that the proceeding would have resulted differently had counsel's representation not been deficient. *People v. Houston*, 229 Ill. 2d 1, 11 (2008).

¶ 35    To demonstrate prejudice in the context of a guilty plea, the defendant must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty but rather would have insisted on a trial. *People v. Hughes*, 2012 IL 112817, ¶ 63. The defendant may not simply allege that he would have insisted on going to trial but rather must either assert a claim of actual innocence or articulate a plausible defense that could have been raised at trial. *Id.* ¶ 64. "[T]he question will depend largely on predicting whether the defendant would have likely been successful at trial." *Id.* In the specific context of an allegation that a defendant was not adequately advised of possible immigration consequences, the defendant must show that a

decision to reject the plea would have been rational under the circumstances. *People v. Guzman*, 2014 IL App (3d) 090464, ¶ 33. In *Guzman*, the court stated that a defendant's family ties and bonds in the United States provided a rational basis to reject a plea deal, because a defendant might be willing to risk a longer prison sentence for even a slight chance of prevailing at trial and thereby avoiding deportation. *Id.* ¶ 35.[2]

¶ 36    Defendant relies on *Padilla*, 559 U.S. 356, where the Supreme Court discussed a defense attorney's obligations regarding advice on immigration consequences. In *Padilla*, the defendant was a lawful permanent resident who faced deportation after pleading guilty to transporting a large amount of marijuana. *Id.* at 359. In his postconviction petition, the defendant alleged that his counsel told him that his plea would not affect his immigration status, and he alleged that he would have insisted on going to trial if he had not received this incorrect advice. *Id.* The Supreme Court stated that changes in immigration law had dramatically raised the stakes of a

_____

[2] In *People v. Pena-Romero*, 2012 IL App (4th) 110780, ¶ 17, the court stated that to show prejudice under the second prong of *Strickland* a defendant with a *Padilla* claim would have to make a claim of actual innocence or articulate a plausible defense. The *Guzman* court did not require such a showing when it determined that ties to this country alone would create a rational basis to reject a plea deal. *Guzman*, 2014 IL App (3d) 090464, ¶ 35; see also *People v. Deltoro*, 2015 IL App (3d) 130381, ¶ 24 ("While the apparent existence of a plausible trial defense *** may make a defendant's showing of prejudice stronger, it is not *required* in order to show prejudice in cases involving counsel's failure to advise a defendant as to the immigration consequences of his guilty plea." (Emphasis in original.)). We do not resolve this potential conflict, because we ultimately decide this case based on *Strickland*'s first prong and we do not reach the question of prejudice.

criminal conviction of a noncitizen and that deportation is a significant part of the penalty that may be imposed on such defendants who plead guilty to certain crimes. *Id.* at 364. The Court stated that the "weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* at 367. The Court stated that it had previously recognized that preserving the possibility of discretionary relief from deportation (under a statute subsequently repealed) would have been one of the main benefits that defendants sought in deciding whether to plead guilty or go to trial. *Id.* at 368.

¶ 37 The Court stated that the terms of the immigration statute applicable to the defendant's situation succinctly, clearly, and explicitly set forth the removal consequences of the defendant's conviction, which the defendant's counsel could have easily determined by reading the statute's text. *Id.* Specifically, the statute stated: " 'Any alien who at any time after admission has been convicted of a violation of *** any law or regulation *** relating to a controlled substance *** other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.' " *Id.* (quoting 8 U.S.C. § 1227(a)(2)(B)(i) (2006)). The Court stated that, in addition to not relating the consequences of the plea, the attorney wrongly gave the defendant false assurance that the conviction would not result in deportation. *Id.* The Court stated that the attorney's representation was clearly deficient because (1) the plea consequences could have been easily determined from reading the removal statute; (2) the deportation was presumptively mandatory; and (3) the attorney's advice was incorrect. *Id.* at 369. The Court went on to say that immigration law could be complex and that there could be situations where the deportation consequences of a particular plea were uncertain or unclear. *Id.* The Court stated that in such situations, where the law is not succinct and straightforward, the duty of a defense attorney is more limited, and he "need do no more than advise a noncitizen client that pending

criminal charges may carry a risk of adverse immigration consequences." *Id.* The Court stated that in contrast, when deportation consequences were truly clear, defense counsel would have a duty to give correct advice. *Id.*

¶ 38 Defendant argues that the trial court seemed to credit Gaffney's testimony that he always told defendant that any drug charge would have a consequence and that defendant should speak to his immigration attorney. Defendant maintains that, under *Padilla*, his drug conviction resulted in clear immigration consequences. Defendant cites a section of the United States Code stating that any alien who is convicted of, or who admits having committed, a violation of any law or regulation relating to a controlled substance is inadmissible. 8 U.S.C. § 1182(a)(2)(A)(i)(II) (2006).[3] An exception applies if the crime was committed when the person was under 18 or the maximum punishment for the crime was one year imprisonment and the person was not sentenced to more than six months' imprisonment. 8 U.S.C. § 1182(a)(2)(A)(ii) (2006). Defendant also cites the definition of "conviction," with respect to an alien, as:

> "a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—
>
>> (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

---

[3] Defendant actually cites "(INA) § 212(a)(2)(A)(i)(II)." This section is codified at 8 U.S.C. § 1182(a)(2)(A)(i)(II) (2006). See *Sarmientos v. Holder*, 742 F.3d 624, 626 n.3 (5th Cir. 2014).

(ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed." 8 U.S.C. § 1101(a)(48)(A) (2006). Defendant argues that the Seventh Circuit interpreted this provision to apply to a plea of guilty and section 410 probation and concluded that the defendant had been "convicted" under the federal statute, even though an adjudication of guilt had been withheld. See *Gill v. Ashcroft*, 335 F.3d 574, 576 (7th Cir. 2003).

¶ 39 Defendant argues that, therefore, since at least 2003, immigration officials have interpreted section 410 probation to be a conviction that can result in both deportation and a denial of any available relief from deportation, and Gaffney had a duty to inform him of these consequences of pleading guilty. Defendant argues that, even if Gaffney told him that his section 410 probation would have negative immigration consequences, the admonishment was insufficient under *Padilla*. Defendant maintains also that it does not matter that Gaffney told defendant to discuss the consequences with his immigration attorney, because Gaffney himself had a duty to investigate and explain the consequences. Defendant notes that there is no evidence that he ever consulted with an immigration attorney about the plea's consequences before entering into it.

¶ 40 The State simply argues that Gaffney satisfied the duty required of him under *Padilla* by telling defendant that the guilty plea would have immigration consequences.

¶ 41 We find *People v. Guzman-Ruiz*, 2014 IL App (3d) 120150, relevant to the question of attorney performance, as it provides a contrast to the case at bar. There, the defendant entered a negotiated guilty plea to unlawful possession of cannabis with intent to deliver. *Id.* ¶ 3. The defendant was a United States resident but not a citizen. *Id.* ¶ 5. The trial court admonished her that the plea could subject her to deportation and then stated:

"They haven't placed a hold on you. They haven't arrested you for ICE so chances are, if they haven't already, they're not going to. But technically, obviously they can always pick you up and deport you solely on the basis of this conviction because you were not a naturalized citizen." *Id.*

The defendant was deported shortly after she completed her 180-day jail sentence. *Id.* ¶ 6.

¶ 42 The defendant filed a postconviction petition alleging that her trial counsel was ineffective for failing to advise her that she would be deported as a result of her conviction. She alleged that he stated that it was a possibility but " 'very unlikely,' " and she alleged that she relied on this inaccurate advice when she entered the fully negotiated plea agreement. *Id.* ¶ 7. The petition proceeded to a third-stage evidentiary hearing, at which the defendant's affidavit was accepted in lieu of testimony. She stated that her attorney advised her that her immigration status would not be affected and that she should plead guilty, and he assured her that immigration consequences would be unlikely. She further stated that he never warned her about deportation (in contrast to her petition's allegations). *Id.* ¶ 9. Trial counsel testified that he never said that defendant would not be deported. Rather, he advised her that he could not guarantee what the government would do if she were convicted of a felony. Counsel testified that he had represented many Hispanics and that in his experience there was " 'no rhyme or reason' " as to who ended up being deported and who did not. *Id.* ¶ 10. He admitted that he did not research federal statutes to determine whether the conviction would affect the defendant's immigration status. The trial court stated that the defendant received a big break through the deal and that, even though it did not admonish her until after she accepted the plea agreement, she was admonished. *Id.* ¶ 12. The trial court also credited trial counsel's testimony that the defendant

knew that it was a " 'roll of the dice' " regarding whether she would be deported. *Id.* It therefore denied the postconviction petition.

¶ 43 On appeal, the appellate court stated that, under section 1227(a)(2)(B)(i) of title 8 of the United States Code, anyone who has been convicted of a violation of law relating to a controlled substance, other than possession of 30 grams or less of marijuana for one's own use, is deportable. *Id.* ¶ 12 (citing 8 U.S.C. § 1227(a)(2)(B)(i) (2006)). The court stated that, even if defense counsel had not researched this statute, as someone with many immigrant clients he should have been familiar with *Padilla*, in which the Supreme Court stated that a conviction of possession of more than 30 grams of cannabis made deportation almost inevitable. *Id.* ¶ 20. Therefore, the appellate court held that defense counsel's representation was deficient because he failed to inform the defendant that if she accepted the plea agreement "deportation would be imminent." *Id.* The court stated that, although a trial court's subsequent admonishments could sometimes counterbalance or even correct deficient legal advice, that was not the situation before it, because the trial court minimized any concerns about the deportation risk, thereby reinforcing defense counsel's deficient advice. *Id.* ¶ 22.

¶ 44 After considering the unique facts of defendant's case, we conclude that the trial court did not err in denying the postconviction petition, because defendant failed to demonstrate that Gaffney's performance was deficient.[4] Unlike in *Padilla* and *Guzman-Ruiz*, defendant was not a legal resident of the United States but rather was here illegally. Thus, not only was he subject to deportation before the crime and guilty plea at issue here, he was actually already involved in

---

[4] Although the trial court focused on the second prong of *Strickland* in denying defendant's petition, we may affirm the trial court's judgment on any basis supported by the record. *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005).

immigration proceedings. As the trial court noted, the immigration court eventually ordered defendant deported based on his illegal presence in the United States and not because of his adjudication in this case. In other words, whereas the defendants in *Padilla* and *Guzman-Ruiz* were allegedly unaware that they could be deported, defendant here was already quite aware of the possibility of deportation based on his illegal presence, to the extent that he and Cazares were holding off getting married for years.

¶ 45    Thus, defendant's claim in this case was that Gaffney affirmatively misadvised him that a guilty plea and section 410 probation would not be a conviction for immigration purposes. This was important to defendant because he hoped to obtain a waiver of his illegal status upon his marriage to Cazares, a United States citizen, which he could not obtain with a conviction. As defendant recognizes, the trial court apparently credited Gaffney's testimony that he told defendant that his plea would have immigration consequences and that he should talk to his immigration attorney.

¶ 46    Defendant maintains that, even with this finding, Gaffney's performance was deficient under *Padilla*. However, the Supreme Court held that the attorney there had a duty to advise his client about the removal consequences of his conviction because they could easily be determined from reading the statute's text. *Padilla*, 559 U.S. at 368. The same statute was at issue in *Guzman-Ruiz*, 2014 IL App (3d) 120150, ¶ 12. The Supreme Court further stated that where "the law is not succinct and straightforward (as it is in many of the scenarios posited by Justice ALITO), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369. In his concurrence, Justice Alito stated that "it may be hard, in some cases, for defense counsel even to determine *** whether a particular state disposition will result in a

'conviction' for purposes of federal immigration law" (*id.* at 380 (Alito, J., concurring)), and he specifically noted that a disposition that is not a conviction under state law, such as a deferred adjudication, might still be considered a conviction for immigration purposes (*id.* at 380 n.2). That is the situation here.

¶ 47 We acknowledge that researching the relevant statute (see 8 U.S.C. § 1101(a)(48)(A) (2006)) and federal case law interpreting that statute (see *Gill*, 335 F.3d at 576) leads to the conclusion that section 410 probation is considered a conviction for immigration purposes, but it is not as clear as the statute at issue in *Padilla*. Moreover, for defendant's particular purposes, Gaffney would have then had to determine whether the conviction would restrict discretionary relief from a bar to admission after deportation even if defendant married a United States citizen, and the text of at least one statute relevant to that issue is even less clear on its face. See 8 U.S.C. § 1252(a)(2)(C) (2006).[5] The ability or inability to apply for relief that a defendant might or might not receive in the future is not the type of clear and certain consequence spoken of in *Padilla*. In other words, we believe that the immigration scenario present here, involving

---

[5] That statute provides: "Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 1227(a)(2)(A)(ii) of this title for which both predicate offenses are, without regard to their date of commission, otherwise covered by section 1227(a)(2)(A)(i) of this title." 8 U.S.C. § 1252(a)(2)(C) (2006).

discretionary relief and potential exceptions and/or waivers, is one in which "the law [was] not succinct and straightforward" (*Padilla*, 559 U.S. at 369), so Gaffney met his obligations by advising defendant that the guilty plea would have some sort of immigration consequences and that he should speak to an immigration attorney. Further, unlike in *Guzman-Ruiz*, here the trial court admonished defendant before accepting his plea that he could be subject to deportation, denial of naturalization, or exclusion of admission to the United States if he was not a citizen. Therefore, defendant failed to make the requisite showing under *Strickland*'s first prong that Gaffney's representation fell below an objective standard of reasonableness. We need not address whether the trial court's ruling that defendant failed to satisfy *Strickland*'s prejudice prong was manifestly erroneous, as the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Balfour*, 2015 IL App (1st) 122325, ¶ 34.

¶ 48                                    III. CONCLUSION

¶ 49    For the reasons stated, we affirm the judgment of the McHenry County circuit court denying defendant's postconviction petition.

¶ 50    Affirmed.

¶ 51    JUSTICE HUTCHINSON, specially concurring.

¶ 52    I concur in the analysis and outcome of the majority opinion in this case. I write separately to remind the lawyers who choose to travel through these immigration minefields that state law and federal law are miles apart in both substance and procedure where immigration matters are concerned.

¶ 53    First and foremost, the lawyer must be familiar with the Illinois Rules of Professional Conduct of 2010. In particular, the Preamble states:

        "As a representative of clients, a lawyer performs various functions. As advisor, a

lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications \*\*\*. As an evaluator, a lawyer acts by examining a client's legal affairs and reporting about them to the client or to others." Ill. R. Prof. Conduct, Preamble (eff. Jan. 1, 2010).

Furthermore, Rule 1.1, which pertains to competence, requires that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Ill. R. Prof. Conduct, R. 1.1 (eff. Jan. 1, 2010). The comment on legal knowledge and skill notes that "[i]n determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, the lawyer's training and experience in the field in question \*\*\*." Ill. R. Prof. Conduct, R. 1.1, cmt. 1 (eff. Jan. 1, 2010).

¶ 54    Based upon the complexity of most immigration matters alone, attorneys not otherwise trained or knowledgeable in immigration law should beware. See, *e.g.*, *In re Winthrop*, 219 Ill. 2d 526 (2006). When a criminal charge at the state level adds another layer to immigration law, the cases cited by the majority reveal issues that could well encourage nightmares during an otherwise peaceful sleep.

¶ 55    Counsel here suggested that an immigration attorney should be consulted before the plea was entered, and that suggestion was excellent. A better practice might be to put that suggestion in writing, in the language of the client, and request a response from the immigration lawyer in writing as well. At a minimum, lawyers should create complete profiles of those seeking their professional assistance to meet their responsibilities as advisor, evaluator, and advocate.